WO                                                                                                    ASH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Edward Lee Jones, Jr., | No. CV 18-02034-PHX-MTL (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Edward Lee Jones, Jr., who is currently confined in the Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants move for summary judgment. (Doc. 55.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 57), and he opposes the Motion. (Doc. 76).

Also pending before the Court are two Motions for Injunction, filed by Plaintiff. (Docs. 73 and 84).

The Court will grant the Motion for Summary Judgment, and deny the Motions for Injunction.

**I.     Background**

On screening Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment and Religious Land Use and Institutionalized Persons Act (RLUIPA) claims against then-Arizona Department of Corrections (ADC) Director Charles L. Ryan and Correctional Officers Slade, Miller, and Guzman; Ryan was sued in his official capacity, and Slade, Miller, and Guzman were sued

in their individual capacities. (Doc. 8). The Court required Defendant Ryan to answer Counts One and Five; Defendant Slade to answer Count Four; Defendant Miller to answer Counts Five and Six; and Defendant Guzman to answer Count Seven. (*Id.*). The Court dismissed Defendants McWilliams, Stickley, and Doe #1, as well as Counts Two and Three and Plaintiff's due process claims. (*Id.*). Defendant Guzman was subsequently dismissed for failure to serve. (Doc. 42).[1] Further, newly appointed ADC Director David Shinn has been substituted for Defendant Ryan pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. (Doc. 87).

Plaintiff's claims relate to ADC's Department Order (DO) 914.07, which prohibits prisoners from sending, receiving, or possessing various forms of "unauthorized content." Put generally, Plaintiff alleges that six compact discs (CDs) and two books that he had ordered in December 2017 and February 2018 were seized on delivery and deemed to be prohibited pursuant to various subsections of DO 914.07. (Doc. 9). Plaintiff alleges that the policy itself violates his rights pursuant to the First Amendment and RLUIPA, and that in applying the policy to his CDs and books, the Defendants have violated his First Amendment and RLUIPA rights. (*Id.*). Plaintiff seeks monetary and injunctive relief, as well as punitive damages. (*Id.*).

## II. Legal Standards

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

---

[1] Although the Court did not explicitly dismiss Count Seven when dismissing Defendant Guzman, Defendant Guzman was the only named Defendant in Count Seven. Accordingly, Count Seven has been effectively dismissed, has not been addressed by the parties in their briefing on the Motion to Dismiss, and will not be discussed here.

- 2 -

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**B.    First Amendment**

<u>1.    Mail</u>

Prisoners enjoy a First Amendment right to send and receive mail. *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995). But prisoners' First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). A regulation that impinges on an inmate's First Amendment rights is valid if that regulation "is reasonably related to legitimate penological interests." *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78 (1987)). Prison security and rehabilitation are legitimate penological interests.

1  *Turner*, 482 U.S. 78, 89 (1987) (prison security); *Pell v. Procunier*, 417 U.S. 817, 823
2  (1974) (rehabilitation); *see also O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996)
3  (deterring criminal activity and maintaining prisoner security are legitimate penological
4  interests that justify regulations on prisoner mail).

To determine the validity of a regulation, courts apply the test established under *Turner v. Safley*, which considers four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest the regulation is designed to protect; (2) whether the prisoner has alternative means of exercising the right at issue; (3) the impact any accommodation would have on guards, other inmates, and allocation of prison resources; and (4) whether there are "ready alternatives" for furthering the government interest, which would suggest that the regulation is an exaggerated response to the jail's concern. *Turner*, 482 U.S. at 89-90. In addition, the Supreme Court recognizes that there are greater security concerns for incoming mail than for outgoing mail. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

This is a deferential standard; courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 528 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). A court does not have to agree with the officials' proffered legitimate penological interest. *Frost*, 197 F.3d at 355. The inquiry under *Turner* is not whether the policy actually serves a penological interest, but rather whether it was rational for jail officials to believe that it would. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) ("prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future") (quoting *Thornburgh*, 490 U.S. at 417).

### 2. Free Exercise of Religion

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). To implicate the Free Exercise Clause, a prisoner must show that the belief at

issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884-85 (noting the Supreme Court's disapproval of the centrality test and finding that the sincerity test in *Malik* determines whether the Free Exercise Clause applies). If the inmate makes this initial showing, he must then establish that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at 884-85.

A regulation that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90.

**C.     RLUIPA**

"RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' but, of course, a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting § 2000cc–5(7)(A)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-3(g)).

RLUIPA requires an inmate to show that the relevant exercise of religion is grounded in a sincerely held religious belief. *Holt*, 135 S. Ct. at 862. Next, the inmate bears the burden of establishing that a prison policy constitutes a substantial burden on that exercise of religion. *Id.*; *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). RLUIPA provides greater protection than the First Amendment's alternative means test.

*Holt*, 135 S. Ct. at 862. If the inmate makes the initial showing, the burden shifts to the government to prove that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d at 995.

A plaintiff cannot sue for monetary damages under RLUIPA and may only sue defendants in their official capacities for prospective injunctive relief. *See Sossamon v. Texas*, 563 U.S. 277, 285-86 (2011) (holding that "appropriate relief" in RLUIPA was not sufficiently specific to abrogate state sovereign immunity with respect to money damages); *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014) (holding that RLUIPA "does not authorize suits against a person in anything other than an official or governmental capacity"); *Flint v. Dennison*, 488 F.3d. 816, 825 (9th Cir. 2007) ("[A] suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity.").

### III. Facts

#### A. The Policy

The policy in effect in 2017 and 2018 when Plaintiff ordered the publications at issue is governed by Departmental Order ("DO") 914, entitled "Inmate Mail." (Doc. 56 at ¶ 5). DO 914 sets forth the procedure for receipt, screening, and delivery of mail at ADC. (*Id.*). DO 914.07 is titled "Unauthorized Content" and provides:

> In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order.

(DO 914.07 § 1.1 (Doc. 56-1 at 16)). Under the policy, a "publication" includes both books and CDs. (DO 914 "Definitions"; Doc. 56 ¶ 7).

As relevant to Plaintiff's claims, DO 914.07 § 1.2.2.3 prohibits "Publications that depict . . . [s]exual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy." (DO 914.07 § 1.2.2.3).

DO 914.07 § 1.2.4 prohibits "Depictions or descriptions of street gangs and/or Security Threat Groups (STG), and related gang/STG paraphernalia, including, but not limited to, codes, signs, symbols, photographs, drawings, training material, and catalogs." (DO 914.07 § 1.2.4; Doc. 56 ¶ 26).

DO 914.07 § 1.2.7 prohibits "Depictions or descriptions, or promotion of drug paraphernalia or instructions from the brewing of alcoholic beverages or the manufacture or cultivation of drugs, narcotics or poisons." (DO 914.07 § 1.2.7; Doc. 56 ¶ 27).

DO 914.07 § 1.2.8 prohibits "Content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another." (DO 914.07 § 1.2.8; Doc. 56 ¶ 29).

DO 914.07 § 1.2.16 prohibits "Pictures, depictions or illustrations that promote acts of violence including, but not limited to, murder, rape, sexual assault, assault, amputation, decapitation, dismemberment, mutilation, maiming, disfigurement, crime scene/autopsy photographs, or cruelty to animals." (DO 914.07 § 1.2.16; Doc. 56 ¶ 28).

DO 914.07 § 1.2.17 prohibits "Content … that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy." (DO 914.07 § 1.2.17).[2]

---

[2] Defendants note that in *Prison Legal News v. Ryan*, No. CV 15-02245-PHX-ROS (D.Ariz. 2015), another Court in this district determined that DO 914.07 § 1.2.17 "violates the first Amendment on its face" as overly broad. (Doc. 55 at 7). At least one other Court in this District has conversely determined that DO 914.07 § 1.2.17 does *not* facially violate the First Amendment. (Doc. 80 at 2) (citing *Williams v. Ryan*, No. CV 17-01833-PHX-DGC (D.Ariz. 2017). *Prison Legal News* is currently on appeal to the Ninth Circuit, while *Williams* remains in litigation in this District. Defendants state that because "[n]o content here was excluded for the sole reason of violating … DO 914.07 [§ 1.2.17]," and "[e]ach item in this case was found to have violated another portion of DO 914.07," DO 914.07 § 1.2.17 "will not be discussed." (Doc. 55 at 7). As such, neither party has argued or briefed that DO 914.07 § 1.2.17 is dispositive of this case.

DO 914.07 § 1.2.20 prohibits "Any publication or part of a publication that, although not specifically set forth herein, may otherwise be detrimental to the safe, secure, and orderly operation of the institution." (DO 914.07 § 1.2.20).

The purpose of DO 914.07 is "to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers…" (DO 914.07 § 1.1; Doc. 56 ¶¶ 2-4).

### B. Application of the Policy Generally

ADC staff pick up ADC mail from the post office and process the mail at each prison complex. (Doc. 56 ¶ 14). Because of the volume of magazines and publications received by prisoners, it is not possible for one person to review all the material to determine if it meets regulations. (*Id.* ¶ 17). Accordingly, each complex designates staff to review incoming magazines and publications, and staff are periodically trained on what to look for in reviewing magazines and publications. (*Id.* ¶¶ 17-18). Staff also check publications against a statewide database to determine whether any particular publication has previously been excluded by another complex. (*Id.* ¶ 17). If one facility has excluded a publication, that exclusion is recorded in the database to ensure that the same publication would be excluded at other facilities or later dates. (*Id.* ¶ 21). Similarly, magazine or periodicals that are allowed are noted as such in the database. (*Id.*).

The Office of Publication Review (OPR) is consulted by publication review staff about publication decisions, and the OPR manages the publication review database (*Id.* ¶ 20). The OPR also handles all appeals of any prohibition decisions by facility staff. (*Id.* ¶ 19). The OPR is staffed by an ADC administrator and seeks to provide consistency in publication decisions. (*Id.*).

All publications are subject to screening and review and must comply with DO 914 before they are delivered to an inmate. (*Id.* ¶ 22). If an inmate or publisher disputes a withholding, they may appeal the decision to OPR within 30 days. (*Id.* ¶ 23). OPR's decision on appeal is final. (*Id.* ¶ 41).

. . . .

**C. The Policy as Applied to Plaintiff's CDs and Books**

1. CDs

On December 10, 2017, Plaintiff ordered 14 CDs from an outside music vendor. (Doc. 9 at 11). On January 31, 2018, six[3] of the CDs were excluded as being in violation of DO 914.07, as follows:

- "Untitled/Unmastered," by Kendrick Lamar, was found to violate DO 914.07 §§ 1.2.16 and 1.2.17;

- "Tha Blue Carpet Treatment," by Snoop Dogg, was found to violate DO 914.07 §§ 1.2.7 and 1.2.16;

- "Street Gospel," by Suga Free, was found to violate DO 914.07 §§ 1.2.2.3, 1.2.4, 1.2.7, 1.2.16, and 1.2.17;

- "Trials and tribulations," by Ace Hood, was found to violate DO 914.07 §§ 1.2.2.3, 1.2.16, 1.2.17, and 1.2.20;

- "The D-Boy Diary Book 1," by E-40, was found to violate DO 914.07 §§ 1.2.4, 1.2.7, 1.2.16, and 1.2.17; and

- "Trilogy," by The Weeknd, was found to violate DO 914.07 §§ 1.2.7 and 1.2.17.

(Doc. 56 ¶¶ 33, 39).

Plaintiff was provided notice of the CDs' non-compliance with DO 914.07 by Defendant Slade. (*Id.* ¶ 34). Slade had no involvement in determining whether the CDs violated DO 914.07; her only involvement was informing Plaintiff that publication review staff had determined the CDs violated DO 914.07. (*Id.* ¶ 35).

Plaintiff sought a second-level review of the exclusions from OPR. (*Id.* ¶ 37). Defendant Miller reviewed the CDs by Kendrick Lamar and Snoop Dogg, and confirmed that they violated the indicated subsections of DO 914.07. (*Id.* ¶¶ 37-38). Specifically, Miller found that tracks 1-3 on the Kendrick Lamar CD, and tracks 1, 4, 6, and 11 of the

---

[3] In their Statement of Facts, Defendants state that "five" CDs were seized. (Doc. 56 ¶ 33). This appears to be a typo, as both parties have argued elsewhere — including elsewhere in the Statement of Facts (*see e.g. id.* ¶ 39) — that *six* CDs were seized.

- 9 -

Snoop Dogg CD, violated the indicated subsections of DO 914.07. (*Id.*). No current Defendant had any involvement in either excluding or confirming that the remaining CDs violated DO 914.07; those decisions were made by the initial publication review staff and confirmed on appeal by Defendant Guzman, who has since been dismissed from this action. (*Id.* ¶ 39).

### 2. Books

On March 23, 2018, Plaintiff submitted a request to have OPR's previous exclusion of two books reviewed. (Doc. 9 at 13; Doc. 56 ¶ 40). The books were *The Fall of America* and *Message to the Blackman in America*, both by Elijah Muhammad. (Doc. 56 ¶ 40). Defendant Miller responded to Plaintiff's request and informed him that both books had previously been excluded as violating DO 914.07 § 1.2.8,[4] that OPR had previously upheld the exclusions, and that these previous decisions were final. (*Id.*). Specifically, the final determination that *The Fall of America* violated DO 914.07 was made on July 6, 2016, and the final determination that *Message to the Blackman in America* violated DO 914.07 was made on May 11, 2012. (*Id.*). No Defendant was involved in the original exclusions of either book in 2016 and 2012, respectively. (*Id.* ¶ 41).

## IV. Discussion

Defendants argue that DO 914 is facially constitutional, that they are entitled to qualified immunity, and even if they are not entitled to qualified immunity Plaintiff's as-applied constitutional claims fail. (Doc. 55).

### A. CDs

#### 1. Plaintiff's First Amendment Facial Challenge (*Turner* analysis)

##### i. *Rational Connection to Legitimate Governmental Interest*

First, the Court must determine whether the governmental objective underlying DO

---

[4] Defendants provide and cite to the April 7, 2017 version of DO 914 (Doc. 56-1) even though the books at issue here were presumably excluded under earlier versions of DO 914. Plaintiff makes no allegation that the previous version(s) of DO 914 under which the two books were excluded is/are materially different from the current version cited by Defendants.

914's exclusion of unauthorized content is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective. *Thornburgh*, 490 U.S. at 414. "In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral. *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004). In *Thornburgh*, the Supreme Court explained that:

> [P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh*, 490 U.S. at 408 (citation omitted).

Here, the stated purpose of DO 914.07 is "to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers . . ." (DO 914.07 § 1.1; Doc. 56 ¶¶ 2-4). These are legitimate penological interests. *Mauro*, 188 F.3d at 1059 (jail security and reducing sexual harassment are legitimate penological interests). Further, the policy is neutral on its face—there is nothing to indicate that the aim of the policy is to suppress expression. *Thornburgh*, 490 U.S. at 415-16 ("the regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression"). Finally, "[t]o show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188 F.3d at 1060 (citation omitted). As long as officials "might reasonably have thought that the policy would advance its interests[,]" the *Turner* standard is met. *Id.* Here, the rational relationship between DO 914.07 and the objectives sought to be addressed by the policy—rehabilitation, treatment, security, and the avoidance of sexual harassment—"is not so 'remote as to render the policy arbitrary or irrational.'" *Mauro*, 188 F.3d at 1060 (citing

*Turner*, 482 U.S. at 89-90) (other citations omitted).

Plaintiff has not refuted that the rationale underlying DO 914 is not rationally related to a legitimate penological interest. Plaintiff does not dispute that rehabilitation, reducing sexual harassment, and preventing a hostile environment are legitimate penological interests, or that the policy is neutral on its face. Plaintiff does allege that "there is no rational connection between ADC's regulation of content advocating alcohol, drugs, violence, and gang activity and the asserted legitimate government interests." (Doc. 71 at 22). Plaintiff asserts that, prior to 2009, sexually explicit materials were permitted in ADC prison complexes, that since 2015 "a majority of the exclusions targeted black artists," and that "OPR is not and has never been consistent in publication decisions." (*Id.* ¶¶ 7-8, 31). Plaintiff also asserts that much of the content prohibited under DO 914.07 is nevertheless available in ADC facilities via other means such as television or radio. (Doc. 68; Doc. 71 ¶ 32; Doc. 75-2 at 52-6, 68-9). However, such arguments only implicate whether the policy *as-applied* violated Plaintiff's rights, not whether it *facially* violates his rights. As noted, the requirement for a policy to be constitutional is that prison officials reasonably believe the policy will advance its legitimate penological interests, not whether the banned material actually caused the problems in the past or is likely to cause problems in the future. *Mauro*, 188 F.3d at 1060. On this record, the first factor of the *Turner* analysis weighs in Defendants' favor.

### ii. Alternative Means of Exercising Right at Issue

The second *Turner* factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Id.* (internal quotations and citations omitted). When analyzing the second *Turner* factor, the Court must view the right in question "sensibly and expansively." *Thornburgh*, 490 U.S. at 417 (citation omitted).

Applying this standard, the issue here is the right to receive explicit music.

Defendants present evidence that ADC prisoners do have alternatives to explicit music, such as access to radio. (Doc. 56 ¶ 49). Further, under DO 914.07, Plaintiff is permitted to receive non-explicit publications. (Doc. 55 at 11.) *Cf., e.g.*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989) (where regulation bans sexually explicit material that threatens institutional security, alternative avenues are available where "the regulations [at issue] permit a broad range of publications to be sent, received, and read"). Plaintiff argues that "music channels provided by ADC only play two radio stations," neither or which Plaintiff listens to, and that ADC also prohibits the "clean version" of songs. (Doc. 71 ¶ 36). Plaintiff further states that although he "could simply listen to country music, rock, metal, Spanish music, blues, or reggae," these "are not alternatives to his preference of music." (*Id.* ¶ 37). As such, Plaintiff fails to dispute Defendants' evidence that there is other material available—it is just not content that he has chosen. Accordingly, this second *Turner* factor weighs in Defendants' favor.

### iii. Adverse Impacts of Accommodation

Third, the Court must consider the impact on the prison and other inmates if inmates were allowed to receive publications that contain prohibited content. *Turner*, 482 U.S. at 90. "If accommodations for a constitutional right would cause significant changes within the prison environment, the courts should give deference to the prison officials who are responsible for safe, effective, and efficient administration of the prison system." *Bahrampour*, 356 F.3d at 975.

Plaintiff argues that "permitting music with explicit content has no significant impact on ADC guards or other inmates . . ." (Doc. 71 at 30-31). Plaintiff asserts that such content "still exists in Arizona prisons," and that inmates are only able to listen to music using headphones. (*Id.* ¶ 40). Plaintiff further asserts that allowing explicit music would actually reduce the burden on prison staff, as they would be able to "focus and energy can be on excluding" otherwise prohibited material. (*Id.* ¶ 41). However, Plaintiff's supposition neglects that prison staff would still have to review *all* material to determine what material should be excluded, and would thus not "minimize" the burden on prison

staff. Further, Defendants have presented evidence that allowing prisoners access to the prohibited material is detrimental to the prison environment because it promotes prohibited behavior; namely gang activity, possession, distribution, and consumption of contraband such as alcohol, and inmate violence. (Doc. 56 ¶¶ 8-13). The fact that such material "still exists in Arizona prisons" does not mean that such material is not prohibited or that it does not promote prohibited behaviors. Accordingly, based on this record, allowing Plaintiff to have access to publications that contain prohibited content would jeopardize prison security and the administration's efforts to prohibit negative behaviors. *See Frost*, 197 F.3d at 358 (applying the same burden-shifting standard set forth under the first prong's common-sense analysis to the third prong analysis). The Supreme Court has stated that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. This third factor, then, weighs in Defendants' favor.

### *iv.* *Obvious Alternatives*

Finally, the Court examines whether the policy at issue is an exaggerated response to the prison's concerns. *Turner*, 482 U.S. at 90. On this prong, Plaintiff bears the burden of showing that there are obvious, easy alternatives to the regulation. *Mauro*, 188 F.3d at 1062. If Plaintiff can identify an alternative that fully accommodates the right at a de minimis cost to valid penological goals, the policy is an exaggerated response. *Turner*, 482 U.S. at 90-91. "If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation." *Bahrampour*, 356 F.3d at 976.

Plaintiff asserts that "Defendants could utilize the already existing ADC regulation DO 803 inmate disciplinary procedures" to "address ADC's alleged concerns." (Doc. 71 ¶ 43). Defendants' respond that using the disciplinary procedures does not address ADC's concerns because DO 914.07 is intended to prevent such harms from occurring in the first

place, while the disciplinary provisions are only meant to remedy prohibited behaviors that have already occurred. This factor weighs in Defendants' favor.

Because all four *Turner* factors weigh in Defendants' favor, DO 914.07 does not violate the First Amendment as to Plaintiff's CDs, and is thus facially valid. Further, because the Court has determined that DO 914.07 is facially constitutional, Defendant Shinn is entitled to summary judgment because he is sued in his official capacity only.

## 2. Plaintiff's First Amendment As-Applied Challenge

Plaintiff sues Defendants Slade and Miller in their individual capacities for damages for the exclusion of the CDs he ordered.

### i. Slade

To prevail in a § 1983 claim, a plaintiff must show that (1) acts by a defendant (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)). In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

Here, Slade has presented evidence that her only involvement was to inform Plaintiff that his CDs had been excluded, and that she had no involvement in the decision to exclude Plaintiff's CDs or any authority to overrule those decisions. (Doc. 56 ¶ 35-36). Plaintiff has not refuted this evidence. Accordingly, Plaintiff has failed to demonstrate that there is a dispute as to any issue of material issue of fact regarding whether Slade violated Plaintiff's First Amendment rights, and Slade is entitled to summary judgment as a matter of law. *See Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).

### ii. Miller

Miller asserts that she was responsible for reviewing Plaintiff's appeal of the exclusion of his CDs, and that she reviewed two of the CDs and agreed that they violated

1  DO 914.07. (*Id.* ¶¶ 37-38). Here, Plaintiff does not allege that the CDs Miller reviewed
2  did not violate DO 914.07, nor does he present any evidence that Miller incorrectly applied
3  DO 914.07. Accordingly, Plaintiff has failed to demonstrate that there is a dispute as to
4  any issue of material issue of fact regarding whether Miller violated Plaintiff's First
5  Amendment rights, and Miller is entitled to summary judgment as a matter of law.

6  Further, because the Court has determined that both Slade and Miller are entitled to
7  summary judgment as a matter of law, the Court does not reach the question of whether
8  they are entitled to qualified immunity.

### B. Religious Texts

10  As noted, to implicate the Free Exercise Clause, a prisoner must show that the belief
11  at issue is both "sincerely held" and "rooted in religious belief." *Malik*, 16 F.3d at 333;
12  *Shakur*, 514 F.3d 884-85 (noting the Supreme Court's disapproval of the centrality test and
13  finding that the sincerity test in *Malik* determines whether the Free Exercise Clause
14  applies). If the inmate makes this initial showing, he must then establish that prison
15  officials substantially burden the practice of his religion by preventing him from engaging
16  in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at
17  884-85. If he satisfies that hurdle, the burden then shifts to Defendants to demonstrate that
18  the infringement satisfies the *Turner* test.

19  Similarly, under RLUIPA, an inmate must show that the relevant exercise of
20  religion is grounded in a sincerely held religious belief. *Holt*, 135 S. Ct. at 862. Next, the
21  inmate bears the burden of establishing that a prison policy constitutes a substantial burden
22  on that exercise of religion. *Id.*; *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-
23  2(b)). If the inmate makes the initial showing, the burden shifts to the government to prove
24  that the substantial burden on the inmate's religious practice both furthers a compelling
25  governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d
26  at 995.

27  Here, Plaintiff has demonstrated that his religious beliefs are sincerely held. (Doc.
28  9 at 13; Doc. 71 ¶¶ 26-27). However, Plaintiff has failed to demonstrate that the exclusion

of his two requested books has substantially burdened his religious practice. In his Complaint, Plaintiff alleged that the exclusion of the books "denied [him the] right to read his Nation of Islam text during Ramadan, *as he normally does every year*." (Doc. 9 at 13) (emphasis added). Plaintiff has been a prisoner in the ADC system since 2008,[5] but did not request the two books until March 2018. (Doc. 9 at 13; Doc. 56 ¶ 40). Plaintiff has not articulated why he was able to successfully observe Ramadan for the 10 years *prior* to 2018, or what has occurred to render him now unable to successfully observe Ramadan *without* the books he requested.

In his Response to Defendants' Motion for Summary Judgment, Plaintiff, for the first time, attempts to expand his claims to include the practice "of his religion in general." (Doc. 71 ¶ 26). Plaintiff attempts to assert that his claim "is not per se about Ramadan itself, but the ability of [Plaintiff], and other similarly situated Nation of Islam followers, to be able to purchase, receive, possess, and read religious literature by their teachers and other members of the Nation of Islam during Ramadan and in general." (*Id.* ¶ 27). However, this expansion of Plaintiff's claim is circumscribed by the claim actually pleaded in the Complaint, which was explicitly limited to Plaintiff's observance of Ramadan. Plaintiff made no indication prior to his Response to Defendants' Motion for Summary Judgment that his claim included the practice of his religion "in general," or that it somehow included "other similarly situated Nation of Islam followers" who wish to "purchase, receive, possess, and read religious literature by their teachers and other members of the Nation of Islam." The Court will not consider new claims raised for the first time in response to a summary judgment motion. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *see also Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006).

Accordingly, limited to the allegations asserted in Plaintiff's Complaint, Plaintiff

---

[5] *See* Arizona Department of Corrections Inmate Datasearch (*available at* https://corrections.az.gov/public-resources/inmate-datasearch) (search "190298" under "Number Search") (*last visited* February 28, 2020).

- 17 -

has failed to demonstrate that Defendants' have substantially burdened the practice of his religion by excluding his two requested books, and Defendants are thus entitled to summary judgment on Plaintiff's Free Exercise and RLUIPA claims.

**V.      Motions for Injunctive Relief**

Plaintiff seeks an injunction ordering ADC not to destroy his seized CDs (Doc. 73), and to order a correctional officer who is not named as a Defendant to this action to provide Plaintiff with his legal boxes.

As to Plaintiff's first Motion, because the Court has determined that Defendants are entitled to summary judgment, Plaintiff's request that his CDs not be destroyed will be denied as moot.

As to Plaintiff's second Motion—which Plaintiff has filed in four separate cases — it is unrelated to the claims at issue in this action. This Court has previously denied Plaintiff's requests for injunctive relief that are unrelated to issues in this case. (Docs. 44, 65). For the same reasons, the Court will do so again here.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 55) and Plaintiff's two Motions for Injunctive Relief (Docs. 73 and 84).

(2)     Plaintiff's two Motions for Injunctive Relief (Docs. 73 and 84) are **denied**.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

(3) Defendants' Motion for Summary Judgment (Doc. 55) is **granted**, and this action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 3rd day of March, 2020.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge